UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-299 (MJD/LIB)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) **POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING** |
| ETHAN MARK DANIELSON, | ) ) ) |
| Defendant. | ) ) |

The United States of America, by and through its attorneys Andrew M. Luger, United States Attorney for the District of Minnesota, and Lauren O. Roso, Assistant United States Attorney, hereby submits its position and memorandum on sentencing as to defendant Ethan Mark Danielson. For the reasons stated below, the United States respectfully submits that a sentence of 37 months' imprisonment, one at the low end of his advisory Guidelines range, is sufficient but not greater than necessary to comply with the factors set forth in 18 U.S.C. § 3553(a).

**I.    THE OFFENSE CONDUCT**

In early 2022, agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives learned that the defendant, Ethan Danielson, was allegedly manufacturing privately made firearms ("PMFs") in Audubon, Minnesota. (ECF No. 76, Presentence Investigation Report ("PSR") ¶ 8.) Their source also provided that Mr. Danielson was converting the PMFs into fully automatic weapons, and that he sold the firearms and/or traded them for methamphetamine. (*Id*.) A preliminary check of the National Firearm Registration Transfer database revealed that Mr. Danielson did not have any National

Firearms Act ("NFA") items (e.g., machineguns, silencers, short-barreled rifles, destructive devices, etc.) registered to him. (PSR ¶ 9.)

On March 26, 2022, agents used a Confidential Informant ("CI") to purchase a silencer device—an item that must be registered under the NFA—from Mr. Danielson. (PSR ¶ 10.) On that night, the CI met with Mr. Danielson and the two entered a shop located on the property Mr. Danielson shared with his family. (*Id.*) Mr. Danielson explained how to assemble and manufacture silencer devices, and the two discussed the CI purchasing such a device on behalf of another person. (*Id.*) The CI then placed a call to an agent who posed as a customer and arranged the sale of one silencer for $600. (*Id.*) Mr. Danielson appeared to assemble the silencer device and provided it the CI in exchange for the $600. (*Id.*) During the transaction, agents observed Mr. Danielson (through electronic surveillance) smoking suspected methamphetamine from a pipe. (*Id.*)

Approximately two months later, on May 16, 2022, agents used the same CI to purchase additional silencer devices from Mr. Danielson. (PSR ¶ 12.) The CI again met Mr. Danielson at Mr. Danielson's property, where Mr. Danielson provided the CI with a demonstration of a silencer device, firing a gun with and without the silencer so the CI could hear the difference. (*Id.*) On that occasion, the CI purchased an additional three silencer devices from Mr. Danielson, none of which were registered in the National Firearms Registration Transfer Database. (*Id.*)

In August 2022, agents again confirmed that Mr. Danielson did not have any NFA items registered to him, nor did he have a Federal Firearms License or Federal Explosive License to manufacture or sell firearms or explosives. (PSR ¶ 13.) Pursuant to a federal

search warrant, agents searched Mr. Danielson's residence, most notably a workshop located on the Danielson family property. (*Id.*) Law enforcement seized a .380 pistol from Mr. Danielson's person and located numerous firearms and firearm components in the shop. Among these were NFA items such as short-barreled rifles and silencer devices. (*Id.*)







3

Mr. Danielson also possessed several other AR-style rifles, at least one with a scope and one with a silencer device attached. (*Id.*)



Of the items seized, approximately 16 were classified as PMFs, meaning they lacked make/model information as well as serial numbers. (*Id.*) Many of these were constructed with Polymer80 products or kits, a popular manufacturer often associated with untraceable "ghost guns."







Finally, in addition to completed PMFs, agents found numerous separate receivers and frames, each of which is considered a "firearm" under 18 U.S.C. § 921(a)(3), as well as component parts for silencer devices and kits that are used to build firearms.  (*Id.*)

5

 

Following the search warrant, Mr. Danielson spoke with law enforcement and provided a post-*Miranda* statement. (PSR 14.) He admitted that he had manufactured PMFs for approximately a year and a half, and that he had begun manufacturing NFA firearms and silencer devices in the past several months. (*Id.*) Of those NFA items, Mr. Danielson reported that one of the short barrel rifles he manufactured had a "forced reset trigger," or a "FRT," which allows for an increased rate of fire. He admitted that he knew it was illegal to possess and manufacture the NFA items but claimed that he never sold any of the PMFs or NFA items he manufactured. (*Id.*) Finally, he admitted that during the time he manufactured the weapons, he was using approximately a ¼ to a ½ gram of methamphetamine per day.[1] (*Id.*)

Based on the above, Mr. Danielson was charged by Indictment with one count of being an unlawful user of a controlled substance in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(8) (Count 1); and one count of possessing an unregistered short-barreled rifle, in violation of 26 U.S.C. §§ 5841, 5845, 5861(d), and

---

[1] User amounts of methamphetamine, as well as smoking devices and other drug paraphernalia, was in close proximately to the firearms recovered. (PSR ¶ 13 n.3.)

5871 (Count 2). (ECF No. 1.) Mr. Danielson pleaded guilty to Count 2 on December 19, 2023, and admitted to possessing approximately 20 firearms (including the unregistered short-barreled rifles) and being an unlawful methamphetamine user. (ECF No. 68 at 2.) He has since accepted responsibility for his criminal conduct, though he maintains a friend "pushed" him to make certain firearms while under the influence of methamphetamine. (PSR ¶ 17.)

## II.   SENTENCING METHODOLOGY AND GUIDELINES

In *Gall v. United States*, the Supreme Court set forth the appropriate sentencing methodology. 552 U.S. 38, 49–50 (2007). First, the district court should calculate the advisory Sentencing Guidelines range. *Id*. at 49. The United States agrees with the calculations presented in the PSR, and briefly addresses Mr. Danielson's outstanding objections below.

### A.   Base Offense Level

The PSR correctly determines, and the parties agree, that Mr. Danielson's base offense level for this crime is **20**, as the offense involved a short-barreled rifle and Mr. Danielson was a prohibited possessor (an unlawful user of a controlled substance). (PSR ¶ 19, citing U.S.S.G. 2K2.1(a)(4)(B).)

### B.   Relevant Conduct

Mr. Danielson objects to the PSR's inclusion of information regarding his sale of silencer devices to the CI described above, as well as its mention of his use of forced reset triggers to create automatic firearms. (PSR A.1.) Neither of these sets of facts impact Mr. Danielson's Guidelines range. Rather, it appears that Mr. Danielson is urging the

Court to disregard these aspects of his criminal conduct in determining a fair and just sentence. While Mr. Danielson's Guidelines are not impacted by these findings, the Court can and should consider all the circumstances surrounding Mr. Danielson's offense, especially where they are so closely connected to the count of conviction.

U.S.S.G. § 1B1.3 Application Note 5(B) explains that factors to consider in determining whether offenses qualify as part of the same course of conduct include (1) the degree of similarity between the offenses, (2) the regularity of the offenses, and (3) the time interval between the offenses. Where one factor is absent, there must be a stronger showing of the remaining considerations. (*Id*.) Here, Mr. Danielson sold multiple NFA items (silencer devices) in spring 2022, which culminated in a search warrant at his workshop several months later. During this time, there is nothing in the record to suggest that Mr. Danielson ceased his manufacturing activities or no longer possessed NFA items. Indeed, the search warrant confirmed that Mr. Danielson continued to possess unregistered NFA items (short-barreled rifles, silencers, and guns with forced reset triggers), all while being a daily methamphetamine user. Because the sale of silencer devices is similar to the possession and manufacture of other NFA items, and the sales occurred more than once leading up to the search warrant, which was executed within six months of when the sales began, the CI sales are properly considered "relevant conduct" for sentencing purposes.

C. **Number of Firearms Enhancement**

The PSR also correctly assesses an additional 4 points as Mr. Danielson possessed over 20 firearms as part of this offense. (PSR ¶ 20, citing U.S.S.G. § 2K2.1(b)(1)(B).) As a threshold matter, Mr. Danielson himself admitted in the factual basis of the plea

8

agreement that law enforcement "found approximately 20 firearms on [his] property," and that those firearms "constitute relevant conduct pursuant to the United States Sentencing Guidelines." (ECF No. 68 at 2.) Even without this admission, though, possession of the additional firearms listed in the PSR constitutes relevant conduct as that concept is outlined above. Mr. Danielson possessed these firearms at the same time he possessed the charged short-barreled rifle, and the circumstances surrounding the possession are identical. Even excluding *all* the rifles Mr. Danielson maintains belong to other family members, the PSR clearly shows that Mr. Danielson possessed more than 8 fully formed PMFs and additional handguns, namely:

- Browning pistol;
- Springfield pistol;
- P80 receiver with advantage arms upper .22;
- Three (3) PF45 Polymer 80 "ghost guns";
- Two (2) PF940C Polymer 80 pistols; and
- Two (2) PF940V2 Polymer 80's with magazines.

This list does *not* include individual receivers and frames that were also seized during the warrant, which themselves constitute "firearms" for purposes of 18 U.S.C. § 921(a)(3) and U.S.S.G. § 2K2.1(b)(1)(B). Notably, Mr. Danielson does not argue that these PMFs and PMF components belonged to anyone but him. Because the enhancement clearly applies, an evidentiary hearing is not warranted, and the Court should simply adopt the PSR's finding as to this enhancement.

### D. Advisory Guidelines Range

Mr. Danielson undisputedly falls within Criminal History Category I. (PSR ¶ 76.) With a base offense level of 20, plus the 4-level enhancement for possessing 8 to 24 firearms, but less 3 points for acceptance of responsibility, the PSR calculates Mr. Danielson's advisory Sentencing Guidelines range as **37 to 46 months' imprisonment**. (*Id.*) This does not differ from one of the ranges anticipated by the parties in the negotiated plea agreement. (ECF No. 68 at 6.)

## III. SECTION 3553(a) SENTENCING FACTORS

After calculating a defendant's advisory Sentencing Guidelines range and hearing from the parties, the district court must consider the sentencing factors set forth in 18 U.S.C. § 3553(a) and make an individualized assessment based on the facts in arriving at an appropriate sentence. *Gall*, 552 U.S. at 49–50; *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors."). Section 3553(a) requires the Court to analyze several factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities."

Consideration of these factors supports a sentence of 37 months' imprisonment. Such a sentence falls at the low end of Mr. Danielson's Guidelines range.

10

### A. The Nature and Circumstances of the Offense

The nature of the offense—making and possessing multiple unregistered NFA items—is a serious and dangerous offense, even when done as a "hobby." This is especially true when the "hobby" involves manufacturing untraceable PMFs, unregistered silencers, AR-style weapons, and firearms with forced reset triggers, all while abusing a highly addictive and dangerous drug. While Mr. Danielson claimed he never sold any of the NFA items or PMFs, his conduct during the controlled buys shows otherwise. There, the CI brokered the sale of a silencer to a buyer that was unknown to Mr. Danielson, yet Mr. Danielson nevertheless agreed to the sale. This is more than selling a silencer to a friend. As the PSR writer correctly notes, "it is concerning that it remains unknown who else these firearms/components were sold to. Even more concerning is that Danielson was under the influence of methamphetamine while making and selling the firearms/components." (PSR ¶ 19.)

Mr. Danielson's conduct may well have contributed significantly to the rise in crime and use of PMFs, which make law enforcement of gun crimes substantially more difficult to prosecute. According to the Attorney General's Office, between January 2016 and December 2020, there were approximately 23,906 suspected PMFs reported to the ATF as having been recovered by law enforcement, including in connection with 325 homicides or attempted homicides. While in 2016, local law enforcement reported to ATF 1,750 suspected PMFs, by 2020, that number had grown to 8,712—an increase of over 400%.

Because Mr. Danielson endangered himself, his friends, his family, and an unknown number of other individuals who obtained these deadly weapons, a significant custodial

sentence is warranted. A Guidelines sentence—one that accounts for the number and nature of firearms involved, as well as Mr. Danielson's status as an unlawful user of controlled substances—appropriately reflects the nature and circumstances of this offense.

### B.     History and Characteristics of the Defendant

Despite the serious nature and circumstances of the offense, the government does recognize several mitigating factors what weigh in favor of a sentence at the low end of Mr. Danielson's Guidelines range. First, Mr. Danielson has little criminal history, and has never engaged in assaultive or otherwise violent behavior. Instead, his history reveals that substance use has always played a significant role in his misconduct. The same appears true here, where he allegedly sold or traded the items he made in exchange for methamphetamine to fuel his addiction. While using methamphetamine, his judgment was obviously impaired, which may have led Mr. Danielson to make choices that he otherwise would not have. This does not excuse his conduct, but instead shows that he was likely motivated by his addiction, not greed or a desire to cause harm.

Second, Mr. Danielson readily accepted responsibility for his actions and seems committed to change. While he stumbled on pretrial release, he eventually completed inpatient treatment and is active in his recovery, which currently includes outpatient programming and frequent NA and faith-based meetings. He has the support of his family and a desire to be a productive member of society. Given his progress and safety net, a draconian punishment is not necessary to serve the purposes of sentencing.

### C. Deterrence, Respect for the Law, and Protecting the Public

Finally, the Court must also consider the need for the sentence to afford adequate deterrence, promote respect for the law, provide just punishment, and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a). A sentence of 37 months' imprisonment, to be followed by a significant period of supervised release, is sufficient, but not greater than necessary, to serve these purposes.

Mr. Danielson admittedly engaged in a significant illegal manufacturing practice for more than a year, despite knowing that what he was doing was wrong. He sold multiple silencer devices, including on one occasion to someone whom he believed to be an anonymous buyer. Mr. Danielson chose to break the law to support his drug habit, and a significant custodial sentence is warranted to discourage both Mr. Danielson and others similarly situated from making the same mistake. Even gun aficionados should recognize the harm that can come with unregulated production and must strive to comply with all applicable laws should they choose to manufacture deadly weapons.

That said, the government recognizes that any custodial sentence will represent a sharp increase in punishment compared to the four-day sentences Mr. Danielson previously served. A sentence of 37 months' imprisonment, one at the low end of his Guidelines range, will impress upon Mr. Danielson a respect for the law and protect the public while he grows in recovery, develops more pro-social skills, and works to build a law-abiding life.

## VI.  CONCLUSION

For the foregoing reasons, the United States respectfully recommends that the Court sentence Mr. Danielson to 37 months' imprisonment.  Such a sentence is sufficient, but not greater than necessary, to comply with the factors set forth in 18 U.S.C. § 3553(a).

Dated:  April 29, 2024                    Respectfully Submitted,

ANDREW M. LUGER
United States Attorney

*s/ Lauren O. Roso*

BY: LAUREN O. ROSO
Assistant U.S. Attorney